934 F.2d 1402
 Fed. Sec. L. Rep. P 97,267
Ralph E. ASCHINGER, Plaintiff-Appellant,
v.
COLUMBUS SHOWCASE COMPANY, Carl J. Aschinger, Sr.,
Defendants-Appellees.
 No. 90-3938.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 6, 1991.
Decided June 6, 1991.
 
 David W. Alexander (argued), Philomena M. Dane, Squire, Sanders & Dempsey, Columbus, Ohio, for plaintiff-appellant.
 Robert M. Duncan, Jones, Day, Reavis & Pogue, Columbus, Fordham E. Huffman (argued), Jones, Day, Reavis & Pogue, Columbus, Ohio, for defendants-appellees.
 Before KRUPANSKY and MILBURN, Circuit Judges; and CONTIE, Senior Circuit Judge.
 CONTIE, Senior Circuit Judge.
 
 
 1
 Plaintiff-appellant, Ralph E. Aschinger, appeals the district court's grant of summary judgment to defendants-appellees, Columbus Showcase Co. and Carl J. Aschinger, Sr., in this action alleging violation of Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j and common law fraud and breach of fiduciary duty under Ohio law. For the following reasons, we affirm.
 
 I.
 
 2
 Plaintiff-appellant, Ralph E. Aschinger ("Ralph"), has brought suit against his brother, Carl J. Aschinger, Sr. ("Carl Sr."), and his former employer, the Columbus Showcase Company ("the Company"), a family owned corporation in the business of manufacturing and distributing showcase display and promotional materials to retailers throughout the United States. The Company was first run by the brothers' father, William Aschinger, Sr., and both plaintiff Ralph and defendant Carl Sr., along with a third brother named William, Jr., worked their entire careers for the Company. Defendant Carl Sr. eventually became treasurer, president, and upon the retirement of William Jr., the Chairperson of the Board of Directors, a position he held from 1976 through 1985. Plaintiff Ralph Aschinger was secretary and subsequently vice chairman and executive vice president in charge of production. Before he retired from the Company, plaintiff also acted as the Company's principal negotiator with the seven labor unions represented in its work force. As members of the Board of Directors, plaintiff and defendant both had access to all financial reports, audit and finance committee reports, and annual reports of the Company. Although the brothers performed different tasks for the Company, they each received the same salary and an equal distribution of the Company's stock from their father's estate upon his death in 1963. This was in accordance with their father's philosophy that his sons should be treated equally despite the fact that each performed different tasks for the Company. This philosophy of equal treatment was maintained for the third generation by means of the Company's stock purchase agreement, which specified that all common stock owned by family members, which became available for purchase, had to be made available to each member of the third generation who was active in the management of the Company in equal proportions.
 
 
 3
 This case arises from plaintiff's disposition of his stock shortly after his retirement from the Company in January 1979. At the time of his retirement, plaintiff owned approximately twenty percent of the outstanding common stock: 1,175 shares of voting common stock and 12,797 shares of nonvoting common stock. Plaintiff also owned 555 shares of preferred stock.[1] Plaintiff's stock was disposed of in two different transactions, one concerning plaintiff's nonvoting shares and another, his voting shares.
 
 
 4
 Because of the concurrence of plaintiff's retirement and the death of the third brother, William Jr., there was a need in the late seventies to reorganize the corporate structure of the Company as the second generation passed on the active management of the business to the third generation. As members of the second generation retired or died, they or their survivors suffered from the Company's traditional policy of paying low dividends on its stock. In an effort to convert the nonvoting stock into a more productive investment, the Board of Directors proposed a voluntary exchange of the Company's outstanding nonvoting common and preferred stock for twelve percent promissory notes payable over a ten-year period. The Exchange Offer was made available to all shareholders except for those family members still engaged in active management of the Company, who were excluded from participating based on tax considerations. The Board of Directors--including plaintiff--reviewed the Exchange Offer and unanimously approved it as a proposal to shareholders on December 4, 1980. The sale of nonvoting common stock pursuant to the Exchange Offer was purely voluntary and was accepted and consummated with respect to every shareholder who was eligible to participate in it. Because defendant Carl Sr. was still active in the management of the Company, he was not eligible to participate in the Exchange Offer.
 
 
 5
 The second transaction involved the sale of plaintiff's shares of voting common stock. It had long been the Company's policy that control of voting stock should reside with family members active in the operation of the business. Under the Company's stock purchase agreement, each member of the third generation had an opportunity to purchase any offered shares in equal amounts. A brief review of the family tree as it existed in 1980 illustrates the members of the third generation at the time plaintiff sold his stock.
 
 
 6
 FAMILY TREE
1st generation William Sr.
 (deceased)
2nd generation
Plaintiff Defendant
Ralph Carl Sr. William Jr. Jerry
(Retired) (Chairman (deceased) Montgomery
 of Bd. of (deceased)
 Directors)
3rd generation
Jerry Wilson Carl Jr. & Berge Jim Montgomery
(son-in-law) William Juskalian
of plaintiff) (defendant's
 sons)
----------
 
 
 7
 In 1980, defendant Carl Sr., the Chairman of the Board of Directors, proposed to his retired brother, the plaintiff herein, that defendant's two sons, Carl Jr. and William, purchase all of plaintiff's voting common stock. Plaintiff rejected this proposal and instead agreed to sell his shares of voting common stock to defendant's two sons, Carl Jr. and William, and to his own son-in-law, Jerry Wilson. Two members of the third generation, Berge Juskalian and Jim Montgomery, waived their rights under the Company's stock purchase agreement to purchase plaintiff's shares of voting stock in equal proportions. Plaintiff and defendant then agreed that three-fifths of plaintiff's voting stock would be sold to defendant's son Carl Jr., one-fifth to defendant's son William, and one-fifth to plaintiff's son-in-law, Jerry Wilson. In 1980, defendant approached plaintiff with a written proposal regarding the transfer, which proposed a price of $50.00 per share. In his deposition, plaintiff stated that he and defendant negotiated only about who would purchase the voting shares. Plaintiff conceded that he never negotiated about the price of the stock and never attempted to discover how the price had been determined.
 
 
 8
 In October 1980, plaintiff agreed to sell his 1,175 shares of voting common stock for $50 per share. Plaintiff sold four-fifths of his voting common stock to defendant's sons and one-fifth to his own son-in-law, Jerry Wilson. In March 1981, plaintiff agreed to sell his 12,797 shares of nonvoting common stock to the Company for $10.00 per share or $127,970 pursuant to the Exchange Offer, which had been approved by the Board of Directors unanimously on December 4, 1980.
 
 
 9
 In September 1983, the Company's existing stock purchase agreement was amended to limit the third generation's ability to purchase the shares of stock owned by defendant, Carl Sr. Rather than allowing all members of the third generation to purchase defendant's shares of stock in equal proportions, the new agreement limited that right only to the direct descendants of defendant.
 
 
 10
 In 1986, defendant Carl Sr., upon retirement from the Company, sold his shares of common stock to his sons, Carl Jr. and William, at a price of $338 per share. Prior to the sale, defendant's common stock had been appraised for estate tax purposes.
 
 
 11
 On August 8, 1987, plaintiff filed suit in the Federal District Court for the Southern District of Ohio, alleging violation of section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 of the Securities Exchange Commission, and common law fraud and breach of fiduciary duty under Ohio law. On January 31, 1989, defendant filed a motion for summary judgment, which was granted by the district court on September 17, 1990. Plaintiff timely filed this appeal.
 
 II.
 
 12
 Plaintiff Ralph contends that defendant Carl Sr. violated the Securities and Exchange Act of 1934, because defendant omitted material facts and misrepresented other facts in regard to the sale of plaintiff's voting and nonvoting common stock. Plaintiff alleges that because he trusted his brother and assumed that the price offered for the stock was fair, he failed to discover by independent means, such as an appraisal, that his stock was worth more than what he sold it for. This court must first determine whether these allegations state a claim for violation of the federal securities law.
 
 A. Omissions
 
 13
 Plaintiff maintains that by virtue of defendants' omissions, defendants are liable for a violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j, and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. Sec. 240.10b-5. Plaintiff contends that in 1980, defendant Carl Sr. proposed that plaintiff sell his shares of voting stock in the Company for $50.00 per share and his nonvoting stock for $10.00 per share. However, defendant did not disclose the method by which he determined the price for the shares of stock and did not disclose that an independent appraisal of the stock had not been made. Plaintiff also alleges that he would have received a higher price under the Company's existing buy/sell agreement, and that even though defendant had this information when he made the proposal to plaintiff, he did not share this information with plaintiff.[2] Plaintiff argues that because he trusted defendant to be fair, he did not obtain or request an independent appraisal of the value of the stock and did not negotiate the price offered to him. Plaintiff contends that the stock at the time of the sale had a value greater than that offered to plaintiff, and plaintiff sold his stock for less than its true value.
 
 
 14
 The first issue which plaintiff raises concerns the legal consequence of defendants' silence. It may be true in the present case that plaintiff did not know the value of what he was giving up; however, plaintiff's lack of knowledge states a claim for violation of section 10(b) of the Securities and Exchange Act only if defendant possessed knowledge unavailable to plaintiff which he had a duty to disclose.
 
 
 15
 Section 10(b) of the Securities Exchange Act of 1934, 48 Stat. 881, 15 U.S.C. Sec. 78j, prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." Pursuant to this section, the Securities Exchange Commission ("SEC") promulgated Rule 10b-5, which provides in pertinent part:
 
 
 16
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 17
 (a) To employ any device, scheme, or artifice to defraud, [or]
 
 
 18
 ....
 
 
 19
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 20
 17 CFR Sec. 240.10b-5 (1979).
 
 
 21
 Under Rule 10b-5, the relationship between corporate insiders and the stockholders of a corporation gives rise to an obligation to "disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." Chiarella v. United States, 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (citing Cady, Roberts & Co., 40 S.E.C. 907, 911 (1961)). Plaintiff attempts to cast his relationship with defendant in this mold, alleging that he was unfamiliar with the finances of the Company. However, by virtue of his position on the Board of Directors of the Company, the material facts about which plaintiff contends he was unaware were readily available to him as well as to defendant. In Chiarella, the Supreme Court held that "one who fails to disclose material information prior to the consummation of a transaction [involving the sale of securities] commits fraud only when he is under a duty to do so." 445 U.S. at 228, 100 S.Ct. at 1114. The issue in the present case is thus whether defendant, in his proposal for the sale of plaintiff's stock, had a duty to disclose the basis for the stock price when plaintiff never inquired about it.
 
 
 22
 In Chiarella, the Supreme Court found that the petitioner had no affirmative duty to disclose information because he was not a corporate insider who had access to confidential information unknown to a shareholder, he was not an agent, not a fiduciary, and not a person in whom the sellers had placed their trust and confidence. Id. at 232, 100 S.Ct. at 1116. In the present case, the relationship between defendant and plaintiff is not one of corporate insider to shareholder. Both plaintiff and defendant were corporate insiders, who had equal access to information. As the district court pointed out, plaintiff had recently been an officer of the Company, who had actively participated in its management and negotiated its labor union contracts, and was an active member of the Board of Directors, who had access to all financial statements and reports of the Company.
 
 
 23
 Plaintiff maintains that because he and defendant were both stockholders in a close corporation, defendant was his fiduciary. However, even if it is true that defendant and plaintiff were fiduciaries to the degree that they were both stockholders in a close corporation, plaintiff has failed to specify what specific fiduciary duty defendant allegedly breached. Majority stockholders in a close corporation owe a fiduciary obligation to undertake (either directly or indirectly through the directors) to conduct, manage and direct the corporation's affairs in good faith in the best interests of the corporation. United States v. Byrum, 408 U.S. 125, 137 n. 11, 92 S.Ct. 2382, 2391 n. 11, 33 L.Ed.2d 238 (1972). A majority shareholder cannot act in his own interest or the interest of others so as to oppress the minority or commit fraud on their rights. Id. at 137-38 n. 11, 92 S.Ct. at 2391 n. 11. In the present case, plaintiff does not allege that these duties were breached. Plaintiff was not a minority shareholder, but instead had held a position commensurate with that of defendant and had equal access to all the relevant information regarding the value of the stock. Moreover, plaintiff has failed to offer any probative evidence that defendant had knowledge concerning the "actual worth" of the stock which he failed to disclose.[3] The disparity in price which defendant received five years later does not provide evidence that a material omission occurred at the time of the sale as the price in five years was not known in 1980.[4] Because plaintiff is unable to provide any probative evidence that material facts existed which were unavailable to him and concealed by defendant, plaintiff has not specified in what way defendant's fiduciary duty to him as a co-shareholder in a close corporation was breached.
 
 
 24
 Plaintiff also argues that because defendant had superior knowledge concerning the worth of the stock he was plaintiff's fiduciary. Plaintiff argues that defendant was involved with the financial affairs of the Company whereas he was not. A fiduciary relationship cannot be predicated on one party's allegedly superior knowledge of the facts surrounding a transaction when the relevant facts are readily available to both parties. Plaintiff cannot transform his brother into a fiduciary by his own failure to investigate a fair price or request an independent appraisal. As previously discussed, plaintiff has not identified any information that was known to defendant, but was not available to plaintiff, involving the value of the stock at the time of the sale or possible future appreciation in the value of the stock. As an active member of the Board of Directors, plaintiff participated in planning meetings during which all aspects of the Company's financial, production, and marketing strategies were discussed. As a member of the Board of Directors, plaintiff also was given, or at least had equal access to, all financial reports, audit and finance committee reports, and annual reports. It is difficult to see how plaintiff could have negotiated with the Company's labor unions without an understanding of the finances of the Company. Moreover, as this court has stated, "an insider has no affirmative duty to direct a seller's attention to all routine data commonly found in the statements and books of the corporation at least where that information is readily available." Arber v. Essex Wire Corp., 490 F.2d 414, 420 (6th Cir.), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974). Likewise, we don't believe that in the present case, defendant had a duty to direct plaintiff's attention to the data that was readily available to him, particularly when plaintiff made no inquiry about how the price for the voting shares had been determined.[5] If defendant had superior knowledge about the value of the stock, it was because plaintiff failed to gain the knowledge that was readily available to him.
 
 
 25
 Plaintiff also argues that defendant was acting as plaintiff's de facto fiduciary in proposing the sale of plaintiff's stock. Plaintiff contends that of the two brothers, defendant was the one familiar with the finances of the Company, who consulted with counsel regarding the financial aspects of the stock transfer, including discussions over the price of the stock. When plaintiff had questions concerning the deal, he contacted defendant. Thus, when he was concerned that the structure of the deal might be affected by a future sale of the Company, he called defendant. Plaintiff argues that because he trusted defendant, he did not seek any advice about the price offered or about whether the deal was a good one. Plaintiff alleges that when defendant met with him in 1980 to discuss the transfer of shares, defendant was acting as the patriarch of the surviving Aschinger family.
 
 
 26
 We do not believe that plaintiff's allegations that a de facto or informal fiduciary relationship was created because plaintiff relied on defendant and placed his trust and confidence in him can withstand defendants' motion for summary judgment. Although plaintiff's failure to get an independent appraisal about the value of the stock may have been detrimental to him, plaintiff has provided no probative evidence that defendant Carl Sr. undertook to act as plaintiff's fiduciary in this regard. Ohio law is clear that a de facto fiduciary relationship can be created "only when both parties understand that a special trust or confidence has been reposed." Umbaugh Pole Building Co., Inc. v. Scott, 58 Ohio St.2d 282, 286, 390 N.E.2d 320 (1979) (emphasis added); see also Moore v. Fenex, Inc., 809 F.2d 297, 301 (6th Cir.) ("Under Ohio law, a fiduciary relationship ... may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed"), cert. denied, 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). When plaintiff called defendant to question him about the possible future sale of the Company, defendant hung up on him. Also plaintiff did not rely on defendant when purchasing the family's lake house from their father's estate, but instead got an independent appraisal. The record thus indicates that plaintiff did not look to his brother's financial expertise in regard to this transaction. The two brothers disagreed about whom plaintiff's stock should be sold to. In the face of this affirmative evidence indicating that an informal fiduciary relationship did not exist, it is not enough for plaintiff to simply say, "He is my brother," to establish a Rule 10b-5 violation. Plaintiff has failed to present probative evidence that both parties understood that plaintiff had reposed a special trust and confidence in defendant and defendant was acting as plaintiff's fiduciary in regard to the sale of the stock. Because plaintiff has not established either a formal or informal fiduciary relationship between himself and defendant, which was breached in the sale of the stock, the district court was correct in granting defendants' motion for summary judgment on this issue.
 
 B. Misstatements
 
 27
 Plaintiff also argues that defendant Carl Sr. made a material misrepresentation which induced him to sell his stock for less than its actual value. Plaintiff contends that defendant Carl Sr. knew that plaintiff trusted him to be fair and relied on his superior financial knowledge. Plaintiff alleges that defendant took advantage of that trust and told him that he would be taking the same deal when he sold his own shares of stock to the Company when he actually had no intention of doing so. Plaintiff contends that the remark, "I'm going to take the same deal," was a material misrepresentation on which plaintiff reasonably relied. Plaintiff testified that he believed the remark meant that defendant would receive the same price for his stock when he retired as that proposed to plaintiff. Plaintiff therefore assumed that the price offered was fair and failed to obtain an independent evaluation or to negotiate the price. However, when Carl Sr. sold his shares of stock five years later, he did not take the same deal. Instead, defendant obtained an independent appraisal and received a price of $338 per share rather than the $10 per share plaintiff received for his nonvoting stock and the $50 per share he received for his voting stock.
 
 
 28
 To establish a violation of Sec. 10(b) of the Securities Exchange Act, plaintiff has the burden of establishing that this alleged misrepresentation about taking the same deal was (1) one of material fact, (2) made with scienter, (3) on which plaintiff reasonably relied, (4) which proximately caused plaintiff's injury. Lucas v. Florida Power & Light Co., 765 F.2d 1039, 1040 (11th Cir.1985); Huddleston v. Herman & MacLean, 640 F.2d 534, 543 (5th Cir.1981), modified on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).
 
 
 29
 This court must first determine whether plaintiff reasonably considered the remark, "I'm going to take the same deal," to be an assessment of the fairness of the price offered.[6] On a summary judgment motion, the facts must be construed in favor of the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Adams v. Union Carbide Corp., 737 F.2d 1453, 1455 (6th Cir.), cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). However, even if this statement is construed as plaintiff alleges he construed it, we question whether the statement constitutes a material fact indicating a fair price. With respect to the Exchange Offer for the nonvoting stock, at the time the alleged remark was made, defendant was still active in the management of the Company and not eligible to participate in the Exchange Offer, a fact of which plaintiff was aware. In regard to the voting stock, defendant in 1980 had no way of knowing the unpredictable fluctuations that the Company and the financial markets might experience during the ensuing years or what the stock would be worth at the time of his retirement. We therefore find it unlikely that a reasonable shareholder would consider this remark to be "material." Information is material if it would "be considered significant to the trading decision of a reasonable investor." Basic, Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 986, 99 L.Ed.2d 194 (1988). Because the date of defendant's retirement had not been decided, defendant was not in a position to speculate about the value of the stock at an unknown future date.
 
 
 30
 Plaintiff contends that even if defendant did not know the exact price he would receive in five years, he did know that he would not be taking the same deal because the stock had a greater value than that offered to plaintiff. Although misrepresentations of future acts may be the basis of a fraud claim when there is no intent to perform these promises, Street v. J.C. Bradford & Co., 886 F.2d 1472, 1483 n. 30 (6th Cir.1989), plaintiff offers no probative evidence that defendant knew at the time of the sale that he would not be taking the same deal because the stock was worth more than the price that was being offered to plaintiff. Without probative evidence that at the time of the sale, defendant was withholding a material fact relative to the value of the stock which he had a duty to disclose, plaintiff's argument fails. Plaintiff conceded in his deposition that he knew of no such fact except that his brother did not take the same deal. However, the fact that five years later after conducting an independent appraisal, defendant received a far greater price than plaintiff did for the sale of his stock is not probative evidence of defendant's knowledge or intentions at the time of the sale of plaintiff's stock. Plaintiff's failure to establish scienter provides an independent basis for dismissing his claim of a violation of Sec. 10(b). See, e.g., Bryson v. Royal Business Group, 763 F.2d 491, 493-94 (1st Cir.1985); In re Phillips Petroleum Securities Litigation, 697 F.Supp. 1344, 1351-53 (D.Del.1988), aff'd in relevant part, 881 F.2d 1236 (3rd Cir.1989).
 
 
 31
 Moreover, we believe it was unreasonable for plaintiff to rely on this statement to assure himself that he was being paid a fair price for his stock, especially when he had access to all the relevant information possessed by the Company and could have investigated and judged the price for himself or requested an appraisal. See Dupuy v. Dupuy, 551 F.2d 1005, 1014 (5th Cir.) ("general principles of equity suggest that only those who have pursued their own interests with care and good faith should qualify for the judicially created private 10b-5 remedies"), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).[7] In the present case, it was not reasonable for plaintiff to assume that defendant's statement represented an unchangeable prediction of the value of the stock in the coming years. It would be impossible to predict years in advance the fluctuating value of the stock in a business which is subject to peaks and valleys as the showcase display industry is. Moreover, no reasonable person would rely on a person's stated intention to accept a fixed price for the value of his stock even if it were to increase in value. Reasonable reliance on an alleged misstatement is necessary in order to state a Sec. 10(b) claim. See Holdsworth v. Strong, 545 F.2d 687, 694 (10th Cir.1976), cert. denied, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977); Rogen v. Ilikon Corp., 361 F.2d 260, 268 (1st Cir.1966). Because plaintiff has failed to make a sufficient showing that the alleged misrepresentation about taking the same deal was a material fact, made with scienter, on which he reasonably relied, the district court was correct in granting defendants' motion for summary judgment on this issue.
 
 III.
 
 32
 Plaintiff finally argues that defendant Carl Sr. committed fraud under Sec. 10(b), because defendant had a duty to disclose to plaintiff that the purpose of the stock transfer was the first step in a long-range plan of defendant to shift control of the Company to his direct descendants.[8]
 
 
 33
 In order to understand how defendant and his descendants gained control, a review of the facts is necessary. In regard to the sale of voting stock, defendant and plaintiff agreed that three-fifths of plaintiff's voting stock would be sold to descendant's son, Carl Jr., one-fifth to defendant's son, William, and one-fifth to plaintiff's son-in-law, Jerry Wilson. Under the then existing stock purchase agreement, each member of the third generation had the right to purchase plaintiff's shares in equal proportions. However, two members of the third generation, Berge Juskalian and Jim Montgomery, waived their rights to purchase plaintiff's shares and plaintiff's own son-in-law, Jerry Wilson, waived his right to purchase an equal proportion of plaintiff's shares. Plaintiff allowed defendant's sons to purchase four-fifths of his voting stock even though the existing stock purchase agreement stated that the stock had to be made available to members of the third generation in equal proportions. Thus at the time of the sale, plaintiff was evidently more interested in liquidating his voting stock than in maintaining control of the Company in his branch of the family.
 
 
 34
 In late 1983, the existing stock purchase agreement was altered to limit the third generation's ability to purchase the shares of stock owned by defendant. Rather than allowing all members of the third generation to purchase defendant's shares of stock in equal proportions, as was the case under the existing agreement, the new agreement limited that right to the direct descendants of defendant. Plaintiff's son-in-law, Jerry Wilson, objected to this change, but because he was afraid of being fired from the Company, he signed the agreement.
 
 
 35
 Plaintiff contends that defendant's "secret plan" to take control of the Company and alter the stock purchase agreement was a material omission. An omission is "material" under Sec. 10(b) if it is information which would be considered significant to the trading decision of a reasonable investor. Basic, Inc., 108 S.Ct. at 986. Plaintiff alleges that he would have considered defendant's plan to gain control of the Company for his own descendants to be significant in making his decision about whether or not to sell his stock.
 
 
 36
 However, plaintiff's allegation that defendant devised a secret plan that defrauded plaintiff's heirs of their rightful ownership of the Company is not borne out by the record. Defendant initially proposed to plaintiff that only defendant's sons purchase plaintiff's stock, alerting plaintiff to defendant's desire to amass control of the stock within his own immediate family. Plaintiff refused this proposal, but then knowingly allowed four-fifths of his stock to be acquired by defendant's sons and only one-fifth by plaintiff's son-in-law. Plaintiff does not allege that he was squeezed out of the Company or forced against his will to accept these proportions. It should have been obvious to plaintiff that the sale of four-fifths of his voting stock to defendant's branch of the family would enable them to gain greater control. Defendant was able to carry out his plan to gain control only because plaintiff's son-in-law, Jerry Wilson, and two other members of the third generation, Berge Juskalian and Jim Montgomery, waived their rights to purchase equal amounts of plaintiff's shares. Plaintiff knew, or should have known, at the time of the sale that he was giving up a significant degree of control in the Company to defendant and his sons and possibly jeopardizing the future of his son-in-law under their auspices.
 
 
 37
 In order to state a violation of Sec. 10(b), plaintiff must establish that defendant's failure to tell him about his alleged "secret plan" to gain control of the Company was the proximate cause of his injury. Lucas, 765 F.2d at 1040. We do not believe that the plan was secret, but instead was obvious. Moreover, it was only because three members of the third generation waived their rights to purchase equal proportions of plaintiff's stock that defendant was able to consummate his plan to gain control. Plaintiff voluntarily acquiesced in this relinquishment of control to defendant and his descendants by selling four-fifths of his voting stock to defendant's sons. We do not believe he can now complain of the consequences. Because defendant's alleged secret plan was not the proximate cause of plaintiff's injury, the district court is affirmed on this issue.
 
 IV.
 
 38
 Finally, this court must decide whether it was an abuse of discretion for the district court to take pendent jurisdiction of plaintiff's state law claims of fraud and breach of fiduciary duty under Ohio law. Under United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), a district court has the power to exercise jurisdiction over pendent state-law claims if the following prerequisites are met: (1) the federal claim must have substance sufficient to confer subject matter jurisdiction on the court, (2) the state and federal claims must derive from a common nucleus of operative fact, and (3) the claims must be such that plaintiff would ordinarily be expected to try them in one judicial proceeding. See also Transcontinental Leasing, Inc. v. Michigan National Bank, 738 F.2d 163, 165-66 (6th Cir.1984).
 
 
 39
 In the case at bar, plaintiff concedes that all these criteria are met, but argues that the district court abused its discretion in exercising this power. Plaintiff argues that in United Mine Workers, the Court stated, "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 383 U.S. at 726, 86 S.Ct. at 1139.
 
 
 40
 However, as this court noted in Province v. Cleveland Press Publishing Co., 787 F.2d 1047, 1054 (6th Cir.1986), this statement in United Mine Workers was modified by the Supreme Court's subsequent statement in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), which stated:
 
 
 41
 We are not willing to defeat the commonsense policy of pendent jurisdiction--the conservation of judicial energy and the avoidance of multiplicity of litigation--by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim.
 
 
 42
 Id. at 405, 90 S.Ct. at 1214. This court stated in Province that when reading United Mine Workers and Rosado together, the following was apparent:
 
 
 43
 [I]t is apparent that trial courts do possess some discretion to decide a pendent state law claim once the federal basis for jurisdiction is dismissed. A trial court must balance the interests in avoiding needless state law decisions discussed in United Mine Workers against the "commonsense" policies of judicial economy discussed in Rosado, when deciding whether to resolve a pendent state claim on the merits.
 
 
 44
 787 F.2d at 1055. The court in Province held that overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial. Id. The Province court found that no abuse of discretion occurred in deciding the state law claims at issue in that case, because there was substantial similarity between the predicate factual findings necessary to the resolution of both the federal and state claims. Id. The court in Province determined that in such a case, the commonsense policies of judicial economy outweighed any benefit in allowing an Ohio court to decide the state law claim. Id.
 
 
 45
 A similar situation exists in the present case. The resolution of both the federal and state law claims depends on whether or not a fiduciary duty was breached, whether the alleged misrepresentation about taking the same deal was a material fact, made with scienter, on which plaintiff reasonably relied, and whether the alleged secret plan to gain control of the Company was the proximate cause of plaintiff's injury. Since discovery had been closed and a substantial amount of time and resources had already been expended, the district court exercised pendent jurisdiction over the state law claims in the interest of judicial economy. We do not believe that in the circumstances of this case, an abuse of discretion occurred.
 
 
 46
 Plaintiff also contends that this court's decision in Gaff v. Federal Deposit Insurance Corp., 814 F.2d 311 (6th Cir.1987) indicates that the district court abused its discretion in taking jurisdiction of the pendent state law claims. However, we find that Gaff is distinguishable. In Gaff, the district court dismissed the plaintiff's federal claim under Rule 12(b)(6) for failure to state a claim. Id. at 319. The Supreme Court has specified that one of the three prerequisites for the existence of pendent jurisdiction is that the federal claim must have substance sufficient to confer subject matter jurisdiction in federal court. United Mine Workers, 383 U.S. at 725, 86 S.Ct. at 1138. When a case is dismissed for failure to state a federal claim, as in Gaff, the federal claim does not have substance sufficient to confer subject matter jurisdiction in federal court. In contrast, in the present case, plaintiff's federal claim of a violation of Sec. 10(b) of the Securities and Exchange Act was not disposed of under Rule 12(b)(6), but on a summary judgment motion. The requirement that the federal claim have substance sufficient to confer subject matter jurisdiction in federal court was met in this case, whereas it was not met in Gaff. Because we believe that in the present case the commonsense policies of judicial economy outweigh any benefit in allowing an Ohio court to decide the state law claims, we believe the district court did not abuse its discretion in taking jurisdiction of plaintiff's pendent state law claims.
 
 V.
 
 47
 The district court did not err in granting summary judgment to defendants on plaintiff's state law claims of fraud and breach of fiduciary duty as plaintiff must prove essentially the same elements under the state provisions as he must prove under the federal provision. See Pelletier v. Zweifel, 921 F.2d 1465, 1511 (11th Cir.1991). The only state case that plaintiff cites, which possibly differs from federal law, is Crosby v. Beam, 47 Ohio St.3d 105, 548 N.E.2d 217 (1989). Plaintiff alleges that under Crosby, each shareholder of a close corporation owes a heightened fiduciary duty to the other. Id. at 108, 548 N.E.2d 217.
 
 
 48
 We find that such a reading of Crosby is far too broad. The case concerned the relationship between a majority shareholder and a minority shareholder in a close corporation. The Ohio court held that the fiduciary duty a majority shareholder owes to a minority shareholder in every corporation obtains in a close corporation and is even heightened. Id. The Crosby court was concerned that a majority shareholder not misuse his power in promoting his personal interests at the expense of corporate interests, which would be detrimental for minority shareholders. In the present case, the relationship between plaintiff and defendant was not that of a minority and a majority shareholder. Moreover, there is no allegation in the present case that defendant used his power to force plaintiff to sell his shares of stock or that the sale was detrimental to corporate interests. For these reasons, we do not believe that Crosby v. Beam applies. The district court properly granted defendants' motion for summary judgment on plaintiff's state law claims.VI.
 
 
 49
 To conclude, the decision of the district court is hereby AFFIRMED.
 
 
 
 [1]
 The disposition of the preferred stock is not at issue in this appeal
 
 
 [2]
 Whether plaintiff would have received a higher price under a then existing buy/sell agreement is contested by the parties
 
 
 [3]
 In a close corporation in which the stock is available for purchase only by family members, this assessment is usually difficult to make absent an independent appraisal
 
 
 [4]
 There is no evidence in the record that plaintiff felt that the price he was paid for his shares of common stock was unfair until defendant sold his stock five years later for a far greater sum
 
 
 [5]
 Plaintiff was well aware that no appraisal had been made in regard to the nonvoting stock as he participated in the decision to approve the Exchange Offer
 
 
 [6]
 Plaintiff Ralph argues that the remark meant that defendant Carl Sr. would sell his stock at the same price. Defendant contends that it meant he would take a similar deferred compensation and consulting agreement
 
 
 [7]
 Plaintiff contends that if a sophisticated businessman does not inquire about price, it is evidence that the buyer is his fiduciary. To the contrary, we believe the failure to inquire about price is evidence of unreasonable reliance
 
 
 [8]
 This claim does not concern plaintiff's sale of nonvoting stock as only the sale of voting stock allowed defendant's descendants to gain control of the Company