**E.B. SMITH, Jr., Plaintiff–Appellant,**

v.

**AMERICAN NATIONAL BANK AND TRUST COMPANY, Defendant–Appellee.**

**No. 91–6505.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 21, 1992.

Decided Dec. 17, 1992.

---

Michael A. Meyer (argued and briefed), Sidwell & Barrett, Franklin, TN, for plaintiff-appellant.

Roger W. Dickson, Marcia J. Meredith, James R. Buckner, Harry S. Mattice (argued and briefed), Miller & Martin, Chattanooga, TN, for defendant-appellee.

Before: KEITH, NELSON, and RYAN, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

The plaintiff in this case signed an agreement with the owner of an automobile dealership to guarantee a loan that the dealership proposed taking out in order to cover overdrafts at the defendant bank. In exchange for the guarantee, the plaintiff was promised half the dealership's corporate stock and a half interest in certain real estate.

The bank made a 90–day loan to the dealership shortly after the agreement was signed, the plaintiff gave his guaranty, and the dealership's overdrafts were paid with the loan proceeds. The dealership subsequently went bankrupt, and the plaintiff sued the bank for securities fraud. The complaint alleged that the bank had wrongfully failed to disclose that the dealership was undercapitalized, that its financial statements were false and misleading, that the business was likely to fail, that the overdrafts were the result of a check-kiting scheme, and that the bank was not planning to renew the 90–day loan unless the plaintiff guaranteed additional indebtedness incurred by the dealership under a floor plan financing arrangement.

On motions filed under Rules 12(b)(6) and 56, Fed.R.Civ.P., the district court decided the case in favor of the bank. The dispositive issues on appeal are whether the bank could be subjected to liability under § 12(2) of the Securities Act of 1933 as a person who "offers or sells a security;" whether the bank could be found to have used any manipulative or deceptive device, in connection with a sale of securities, in violation of § 10(b) of the Securities and Exchange Act of 1934 and the rules adopted thereunder; and whether the bank could be held liable for fraud under the common law of Tennessee. Resolving each of these questions in favor of the bank, we shall affirm the challenged orders of the district court.

I

The dealership in question, Scenic City Motors, Inc., sold Mazda cars at a location on Rossville Road in Chattanooga, Tennessee. An individual named Larry Cooper purchased the dealership in 1985, using funds that he borrowed from Southeast Federal Savings and Loan Association of Rossville, Georgia.

Mr. Cooper tried unsuccessfully to obtain floor plan financing from Southeast Feder-

**938**

al.[1]  He had better luck with the defendant, American National Bank and Trust Company, which began providing floor plan financing soon after Southeast Federal declined to do so.

Scenic City did not appear to experience any major financial problems until sometime in 1987.  Car sales began to dip at that point, Mr. Cooper began to take more cash out of the dealership for personal expenses, and the dealership began to go "out of trust" at the bank.  The bank responded by increasing the frequency of its on-site floor plan inspections.

The dealership's annual financial statement for 1987, which was received by the bank on May 16, 1988, showed that the company had a bank overdraft of $351,139. An interim financial statement for the four months ending April 30, 1988, showed an overdraft of $435,333.

There is no direct evidence that the bank loan officer responsible for the Scenic City account, a man named William Smith, was concerned about the overdrafts as such. He was concerned, however, about the small amount of net income reported for 1987, which was less than $42,000; the dealership's unaudited interim financial statements had indicated that net income would be at least $100,000 higher.  Mr. Cooper attributed the discrepancy to sloppy bookkeeping and a problem over rebates from Mazda, but loan officer Smith was not totally satisfied by this explanation.

The bank was also unhappy about a plan devised by Mr. Cooper for building new facilities at a location on Chapman Road, Chattanooga's "Import Row."  The bank advised against this move and turned down a request to provide financing for it.  Mr. Cooper went ahead with the project anyway, using the proceeds of a Small Business Administration loan obtained elsewhere.

The bank was concerned about the additional debt, and on September 12, 1988,

loan officer Smith told Cooper that the bank wanted him to move his floor plan financing to another lending institution within some reasonable period of time. Mr. Cooper then began to approach other dealers to see if they would be interested in investing in Scenic City.

One of the people Mr. Cooper contacted in the fall of 1988 was the plaintiff, E. B. Smith, Jr., who operated dealerships in Nashville.  Plaintiff Smith (who is not to be confused with loan officer Smith) said that Scenic City sounded like a good investment, but he told Cooper that he did not have the cash to put into it.  Plaintiff Smith knew nothing about Cooper's background and did not investigate it.

Late in 1988 Mr. Cooper retained a new accounting firm to work on the audited financial statement for that year.  After conducting a preliminary review, the firm declined to perform an audit.  The job was turned down, according to the accountant who made this decision, because Scenic City was badly out of trust, its records were "horrendous," and the company proved to have been kiting checks.

The accountant discovered the kite after noticing "a circular pattern of checks moving between two [Scenic City] bank accounts."  Mr. Cooper, when asked about this, admitted to the accountant that he would overdraw his American National account, present the check for deposit at Southeast Federal, and then write a Southeast Federal check against those funds for deposit in the American National account.

An affidavit given by Scenic City's general manager, Harley Gilreath, says that Mr. Cooper engaged in check kiting to cover shortages created by his going out of trust.  There is a dispute as to whether American National Bank was aware of the check kiting, but an expert retained by the plaintiff gave a deposition in which he testified that the bank should have known of it.

1.  Under this type of inventory financing, the lender advances funds to the dealer for the purchase of automobiles and takes a security interest in the cars.  When the dealer sells an individual car, he is supposed to hold the proceeds of the sale in trust for the lender.  If the dealer fails—as Cooper's dealership often did—to remit the money promptly, he is said to be "out of trust."

The expert added that it was hard to see how the bank would not have known.

American National routinely allowed Scenic City to draw against checks that had been deposited but not yet collected. Southeast Federal evidently allowed this too. In March of 1989, however, Southeast Federal started returning Scenic City checks that were drawn on uncollected funds. On or about March 24, 1989, according to general manager Gilreath, Southeast Federal contacted Mr. Cooper and told him it was returning checks for approximately $600,000 to American National Bank.

The bank's brief asserts that Mr. Cooper called loan officer Smith at this point; the Gilreath affidavit says that it was Smith who called Cooper. Be that as it may, the record contains no testimony from either Cooper or loan officer Smith as to what was said. According to the Gilreath affidavit, the bank wanted to terminate its relationship with Scenic City as quickly as possible; "Bill Smith agreed that [the bank] would not take such action," the affidavit continues, "if Cooper got somebody to sign a note to cover the checks by the following Monday."

Sometime on March 24 (a Friday) Mr. Cooper telephoned plaintiff E. B. Smith in Nashville. Cooper said that he still wanted somebody to invest in the dealership, and Mr. Smith was given to understand that Cooper needed $500,000 to cover checks that he had written against nonexistent funds. Mr. Cooper proposed to transfer Scenic City stock to Mr. Smith in consideration of Smith's signing a note for the $500,000. Mr. Smith agreed to meet with Cooper in Nashville on Sunday, March 26, to discuss this proposal face-to-face.

At the Sunday meeting, which lasted between one and one-half and two hours, Mr. Cooper showed plaintiff Smith unaudited financial statements for 1988 and January and February of 1989, plus real estate documents and materials on the Small Business Administration loan for the new facilities on Import Row. Mr. Cooper repeated that he needed $500,000 to cover checks due at the bank on Monday morning, but he did not tell plaintiff Smith what the checks had been written for, or how he knew that they would be at the bank on Monday, or anything about his relations with defendant American National Bank.

Mr. Smith made no inquiry about any of these matters. Neither did he ask about Cooper's floor plan financing. Mr. Smith subsequently testified that it did not cause him any concern at the time that Cooper was in need of an immediate infusion of $500,000 to cover checks he had written.

The men reached an agreement before the Sunday meeting ended. Mr. Smith wrote out the terms of the agreement in longhand, and both men signed it. The document recited, among other things, that in consideration of Smith's guaranteeing a capital loan to Scenic City, Cooper would immediately quitclaim to Smith an undivided half interest in a tract of land on Chapman Road, while 50 percent of Scenic City's stock would be issued to Smith.[2] The final paragraph read as follows:

> "This agreement is contingent upon E.B. Smith, Jr. and Larry Cooper jointly being able to secure an acceptable capital loan for Scenic City Motors Inc."

Plaintiff Smith, who had never done any business with the defendant bank, had a brief meeting with officials of the bank and Mr. Cooper on Monday morning, March 27.[3]

**2.** The parties subsequently agreed to convert the purchase agreement into an option agreement, according to plaintiff Smith's testimony, because they discovered that the Small Business Administration loan would have to be reapproved if any Scenic City stock were actually transferred. The record contains no documentation on the option agreement. It appears to be undisputed that Scenic City was a closely held corporation and that Mr. Cooper was the controlling shareholder.

**3.** During the course of this meeting, according to the testimony of Rufus Triplett, the bank's head cashier, Mr. Triplett received a telephone call in which Southeast Federal advised him that it was returning Scenic City checks that had been drawn on uncollected funds. Mr. Triplett then examined the Scenic City account, saw that the return of these items would create an overdraft in the neighborhood of $550,000 to $600,-000, and reported this information to the offi-

Mr. Smith presented a personal financial statement showing that he had a net worth in excess of $8 million, Mr. Cooper presented the agreement he had signed with Smith, and the bank was asked to give "fast track" approval of a $500,000 loan. The bank undertook to give an answer that afternoon, before plaintiff Smith returned to Nashville.

Smith and Cooper then left the bank to inspect Scenic City's facilities, meet with the dealership's employees, and have lunch. (Mr. Smith did not take this opportunity to look at any Scenic City records.) A bank official made some telephone calls in the meantime to check on Mr. Smith, and approval was then quickly granted for a loan of $600,000.

When Cooper and Smith returned to the bank after lunch, Mr. Smith was pleasantly surprised to find that the bank was willing to lend an additional $100,000. Smith knew that loan proceeds would be used to cover checks that had been returned to the bank, but there is no evidence that he asked the bank for any information about the checks or about Scenic City's financial condition. Messrs. Smith and Cooper proceeded to sign a 90–day note in the amount of $600,-000,[4] and the meeting ended after 15 or 20 minutes.

The bank's president, Al Duke, testified at his deposition that the term of the note was set at 90 days to give Messrs. Smith and Cooper plenty of time to line up financing elsewhere. Mr. Smith was said to have indicated that his relations with his own bank (the First American of Nashville) and with his own floor plan lender were "so good that he would have [the financing] moved by the maturity of the note." Plaintiff Smith testified at his deposition that he did not recall any discussion about moving Scenic City's floor plan line to another bank, but he acknowledged that no one told him that the defendant bank would be willing to renew the $600,000 note when the 90 days had run.

A "Criticized Loan/Asset Report" prepared by the defendant bank in March of 1989 gave the following explanation of why Scenic City's floor plan indebtedness (which then stood at $2,093,292) and the $600,000 note had been placed on "criticized" status: "Shortages of working capital and mismanagement of depository funds resulted in a $600,000 overdraft which was subsequently funded under a short term note." The "goal" stated in the report was to receive full payout in June of 1989. The report stated, in this connection, that "Mr. Smith is negotiating with First American Bank of Nashville, with whom he has a strong banking relationship, as a takeout for all AMB debt."

When the $600,000 note came due in June of 1989, the defendant bank's president testified, arrangements to move the financing to another lender had still not been worked out. The defendant bank agreed to renew the note in exchange for plaintiff Smith's guaranteeing Scenic City's floor plan indebtedness. There is no evidence to support the contention that the bank intended all along to have Mr. Smith assume responsibility for the floor plan debt.

Scenic City filed for relief under Chapter 11 of the Bankruptcy Code late in 1989, and the proceeding was converted into a Chapter 7 liquidation early in 1990. Plaintiff Smith brought this lawsuit in June of 1990. The bank then counter-claimed on the guaranties.

Ruling on a motion filed by the defendant bank under Rule 12(b)(6), Fed.R.Civ.P., the district court (Jarvis, J.) dismissed the 1933 Securities Act claim on the ground that the complaint did not allege that the bank had solicited Mr. Smith's purchase of stock or a stock option. In November of 1991, after extensive discovery proceedings, the court granted summary judgment for the bank on the claims that remained outstanding. The bank's counter-claim

---

cials who were meeting with Messrs. Smith and Cooper.

**4.** Scenic City was the principal obligor, and Smith and Cooper signed as guarantors. The

note was collateralized with accounts receivable and equipment and inventory other than autos and trucks.

was dismissed without prejudice pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Mr. Smith has perfected a timely appeal to this court.

## II

Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), provides in part that any person who "offers or sells a security" by means of a communication that omits to state a material fact necessary to make such person's material statements "not misleading" shall be liable to the purchaser for recisionary damages. Under § 2(3) of the Act, the term "offer" includes a "solicitation" of an offer to buy a security. 15 U.S.C. § 77*b*(3).

■ Plaintiff Smith argues that he has a claim against the bank under § 12(2) because the bank was the "prime mover" behind Cooper's proposed sale of Scenic City stock; because, as the complaint alleged, "the sale of the stock option to plaintiff was part of a workout scheme devised by Cooper and defendant ... to enable defendant to avoid or reduce its loss exposure on defendant's loans to Scenic City;" and, presumably, because the bank failed to disclose material facts about Scenic City's check-kiting etc. that were necessary to make the bank's statements not misleading. The district court rejected Smith's argument, concluding that the complaint failed to state a claim under § 12(2) because it failed to allege that the defendant bank solicited plaintiff's purchase. We think that the district court was correct in this conclusion.

■ The fact that one is not an actual owner of securities does not necessarily prevent him from being a statutory seller. A non-owner cannot be a seller, however, unless he urges a prospective purchaser to buy. See *Pinter v. Dahl*, 486 U.S. 622, 644–45, 108 S.Ct. 2063, 2077–78, 100 L.Ed.2d 658 (1988), where the Supreme Court observed in connection with § 12(1) (which contains the same "offers or sells" language) that

"[a] natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer 'purchased,' even though the agent himself did not pass title. See *Cady v. Murphy*, 113 F.2d 988, 990 (C.A. 1), (finding broker acting as agent of the owner liable as a statutory seller), *cert. denied,* 311 U.S. 705 [61 S.Ct. 175, 85 L.Ed. 458] (1940)."

It is not enough that the putative seller stands to benefit if the sale goes through; to be liable under a solicitation theory, he must have engaged in actual solicitation.

Prior to the Supreme Court's decision in *Pinter v. Dahl*, courts in this circuit borrowed a "proximate cause" theory of liability from the law of negligence and held that a defendant who did not actually pass title to securities could be treated as a seller under § 12(2) if "the injury to the plaintiff flow[ed] directly and proximately from the actions of this particular defendant." See *Davis v. AVCO Financial Services, Inc.,* 739 F.2d 1057, 1065–66 (6th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985), citing cases and quoting *Lennerth v. Mendenhall,* 234 F.Supp. 59 (N.D. Ohio 1964). The Fifth Circuit and others followed a similar approach, also developed from general tort law, under which a seller was defined as one "whose participation in the buy-sell transaction is a *substantial factor* in causing the transaction to take place." *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980) (emphasis supplied), *subsequent opinion on rehearing,* 625 F.2d 1226 (5th Cir.1980); *cf. Schlifke v. Seafirst Corp.,* 866 F.2d 935, 940 (7th Cir.1989), where pre-*Pinter* cases from other circuits are collected.

The Supreme Court squarely rejected the "substantial factor" approach in *Pinter*, saying "[t]here is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who 'offer,' including those who 'solicit' offers."

486 U.S. at 650, 108 S.Ct. at 2080. The test is not whether the defendant was a "substantial factor" in causing the sale of securities, but whether the defendant either passed title or offered to do so, or solicited an offer.

Applying this test to the § 12(2) claim asserted in plaintiff Smith's complaint, we conclude, as did the district court, that the facts alleged are not sufficient to make the defendant bank a person who "offers or sells a security...." The complaint does not allege that the bank passed title to any shares of Scenic City stock or offered to do so. Neither does the complaint allege that the bank solicited an offer from plaintiff Smith to buy the stock.

What the complaint does allege is that "*Cooper* contacted plaintiff and offered to sell...." (Emphasis supplied.) Under *Pinter*, this is simply not enough. The complaint can be read as suggesting that the bank encouraged Cooper to find an investor as an alternative to losing his line of credit and thereby losing his entire business, but this would not make the bank a statutory seller unless the bank actively participated in the solicitation of an offer to purchase the stock. The complaint contains no allegation that the bank did any such thing—and as we know from the discovery materials filed in connection with the bank's motion for summary judgment, the fact is that the bank did not solicit such an offer. The case at bar thus bears a close resemblance to *Schlifke v. Seafirst Corp.*, 866 F.2d 935, *supra*, where a bank that provided financing for ENI Corporation, a seller of limited partnership interests in an oil and gas venture, was held not to be a statutory seller:

> "The Bank did not actively participate in the solicitation of investors, nor did it participate in the preparation of the Prospectus.... The Bank had no contact with ENI sales personnel, nor did it otherwise actively promote the investment program. Even viewing the record in the light most favorable to the plaintiffs, the Bank's activities do not approximate those activities giving rise to section 12(2) liability under the liberal tests applied in other circuits. *See, e.g., Davis v.*

*AVCO Financial Services, Inc.*, 739 F.2d 1057 (section 12(2) liability imposed on finance company whose manager attended and made speeches at promotional meetings, represented that scheme was a good quality investment, furnished loan applications and generally contributed to the selling momentum)." *Id.* at 940–41.

### III

In Count II of his complaint, plaintiff Smith alleged that the defendant bank withheld information about Scenic City's business under circumstances that subjected the bank to liability under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78*j* (b), and Rule 10b–5 of the SEC, 17 C.F.R. § 240.10b–5. The bank was claimed to be liable both directly and as an aider and abettor of Mr. Cooper.

On the basis of facts as to which there was no genuine issue, the district court held that the bank was entitled to judgment as a matter of law on Count II. Central to the court's decision on this phase of the case was the conclusion that plaintiff was unable to show that the bank had any duty to disclose the information in question. We agree with the court's conclusion.

■ Section 10(b) of the 1934 Act makes it unlawful to use or employ, in connection with the purchase or sale of securities, any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe...." Pursuant to this statutory provision— which was designed as a "catchall clause to prevent fraudulent practices," *Chiarella v. United States*, 445 U.S. 222, 226, 100 S.Ct. 1108, 1113, 63 L.Ed.2d 348 (1980)—the Commission has adopted a rule (Rule 10b–5) making it unlawful, in connection with the purchase or sale of any security,

> "(a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the cir-

cumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5.

The language of § 10(b) of the Act does not specifically address the legality of non-disclosure. Rule 10b–5(b) does address it, of course, and it is well established that "silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b)...." *Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115. Silence is not actionable, however, unless there is "a duty to disclose arising from a relationship of trust and confidence...." *Id. Cf. Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5.") A duty to disclose arises "when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " *Chiarella*, 445 U.S. at 228, 100 S.Ct. at 1114, quoting Restatement (Second) of Torts § 551(2)(a) (1976).

Our case law makes it very clear that "[a] fiduciary relationship cannot be predicated on one party's superior knowledge of the facts surrounding a transaction when the relevant facts are readily available to both parties." *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1408 (6th Cir.1991). We affirmed a summary judgment for the defendant in *Aschinger* where "the material facts about which plaintiff contends he was unaware were readily available to him as well as to defendant" and where the plaintiff never inquired about the information possessed by the defendant. *Id.* at 1407.

Plaintiff Smith cannot show that the material facts about which he contends he was unaware were not readily available to him—for like the plaintiff in *Aschinger,* he never inquired about them. Prior to the meeting with the bank, for one thing, Cooper told Smith that the reason he needed half a million dollars immediately was to cover outstanding checks that were going to have to be made good at the bank on Monday, March 27. Mr. Smith made no inquiry at all about the reason for the overdrafts; he did not ask Cooper, and he did not ask the bank officials with whom he subsequently met.

If the bank knew about the check-kiting—and we shall assume that it did—the bank still had no duty to answer questions that plaintiff Smith never asked. For all the bank knew, Cooper had told plaintiff Smith about his check-kiting activities, just as he had told the accounting firm. "[A] person who does not undertake to furnish any information, and who is not aware of what information has been furnished, is under no duty to disclose material information in his possession." *Securities and Exchange Commission v. Washington County Utility District,* 676 F.2d 218, 223 (6th Cir.1982).

As far as Scenic City's out-of-trust position under the floor plan arrangement is concerned, similarly, plaintiff Smith made no inquiry at the bank. And although there is a factual dispute as to whether plaintiff Smith was told that the bank wanted the floor plan line moved to another lender, the dispute turns out to be immaterial. Despite his familiarity with floor plan financing—a type of financing used by virtually all automobile dealers, including himself—plaintiff Smith admits that he knew nothing about the relationship between Cooper and the bank and never asked about it. At the meetings with the bank, he testified, there was simply no discussion of the floor plan line.

With regard to the claim that the bank had a hidden plan to force plaintiff Smith to guarantee the entire floor plan line, Mr. Smith conceded at his deposition that he had no knowledge of any facts to substantiate the claim. The documentary evidence indicates that far from planning to get the floor plan indebtedness guaranteed by Smith, the bank was planning on another lender's taking over within 90 days. If the bank had stuck to that plan and refused to extend any further credit when the 90–day note came due, it would doubtless have

been better for all concerned, including the bank.

As to the contention that the bank had a duty to volunteer information about Scenic City's financial records and undercapitalization, finally, the short answer, again, is that if Mr. Smith had wanted such information from the bank he ought to have asked for it. It is important to remember, in this connection, that plaintiff Smith met with Cooper and agreed to buy the half interest in Scenic City on Sunday, March 26, the day *before* Smith had his first meeting with the bank. When the bank officials were introduced to Smith on Monday morning, March 27, they had no knowledge of what information Cooper had furnished Smith about Scenic City's capitalization. There has been no showing, moreover, that they knew Smith had been shown fraudulent financial records. Neither has it been shown that the bank made any statements to Smith under circumstances that rendered the statements misleading because of a failure to disclose information known to the bank but not available to Smith.

█ The fact that the bank was in the business of lending money did not subject it to any special duty of disclosure. A lending institution has no duty to disclose based on its role as a lender. *Schneberger v. Wheeler,* 859 F.2d 1477, 1480 (11th Cir. 1988), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989). And knowledge of a customer's weak financial situation "amounts neither to a duty to disclose this information nor to knowledge of fraud." *Id.* at 1481.

Mr. Cooper may or may not have violated the securities laws, but plaintiff Smith clearly could not make out a § 10(b)/Rule 10b–5 claim against the bank for aiding and abetting him. "A claim of aiding and abetting under these sections requires allegations that the accused party knowingly and substantially assisted another party's violation of the securities law, and that the accused had a general awareness that it was participating in an overall improper activity." *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.,* 973 F.2d 474, 486 (6th Cir.1992), *cert. de-*nied, —— U.S. ——, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993).

For the reasons already explained, there is no way plaintiff Smith could have made out a jury issue on whether the bank had any "awareness," general or specific, that it was participating in improper activity. We find nothing to the contrary in *Molecular Technology Corp. v. Valentine,* 925 F.2d 910 (6th Cir.1991), where there was ample evidence from which a jury could have found that certain of the defendants were knowing and substantial participants in a securities fraud.

In cases involving non-disclosure, moreover, the requirement that the alleged aider and abettor knowingly and substantially assisted another party's security violation is "particularly exacting." *Moore v. Fenex, Inc.,* 809 F.2d 297, 303 (6th Cir.), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). The plaintiff "must show that the silence of the accused aider and abettor 'was consciously intended to aid the securities law violation,' and must prove either a culpable state of mind, or conduct from which a culpable state of mind can be inferred." *Id.* at 303–04, quoting *Washington County,* 676 F.2d at 226. Plaintiff Smith has failed to surmount this hurdle as well.

## IV

The district court dismissed plaintiff Smith's pendant state law fraud claim "because it is clear under Tennessee law that the Bank had no duty to disclose any information to plaintiff under the facts of this case." The court relied in this connection on *Macon County Livestock Market, Inc. v. Kentucky State Bank, Inc.,* 724 S.W.2d 343 (Tenn.App.1986), the facts of which are closely analogous to those presented here.

Plaintiff Smith attempts to distinguish *Macon County* on the ground that there the defendant bank "had no financial interest in the loan, except from the interest revenue to be derived from the loan," whereas in the case at bar the defendant bank not only derived interest from Scenic

City's $600,000 loan, it derived a benefit from the fact that Scenic City's unsecured debt was reduced. It does not appear to us, however, that the latter circumstance—of which plaintiff Smith was fully aware at the time—could give rise to a duty of disclosure that would not have existed otherwise. The district court did not err in dismissing the state law claim.

AFFIRMED.