**MONTCALM COUNTY BOARD OF COMMISSIONERS, Plaintiff,**

v.

**McDONALD & COMPANY SECURITIES, INC., an Ohio corporation, and Lisa Lowe Chigas (f/k/a Lisa Lowe), an Illinois citizen, Defendants.**

No. 4:90–CV–114.

United States District Court,
W.D. Michigan, S.D.

July 12, 1993.

Robert L. DeJong, Lee T. Silver, Douglas W. VanEssen, Gwen E. Buday, Clary, Nantz, Wood, Hoffius, Rankin & Cooper, Grand Rapids, MI, for plaintiff.

John W. Allen, Michael D. Schlack, Howard & Howard, PC, Kalamazoo, MI, for defendants.

## OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HILLMAN, Senior District Judge.

Plaintiff Montcalm County Board of Commissioners ("Montcalm County") filed this action against defendant McDonald & Company Securities, Inc. ("McDonald"), an Ohio corporation, and defendant Lisa Lowe Chigas ("Chigas"). Plaintiff alleges that defendants were negligent and breached their common law fiduciary duties owed to the County. Plaintiff further alleges that defendants breached their statutory duties to plaintiff in connection with the transaction of the Drexel Burnham Lambert ("Drexel Burnham") commercial paper. Subsequently, when Drexel Burnham went bankrupt in 1990, plaintiff lost its investment in Drexel Burnham worth $559,265.81 plus interest. Specifically, the complaint alleges a violation of section 12(2) of the Securities Exchange Act of 1933, 15 U.S.C. § 77l (2); a violation of § 17(a) of the 1933 Act, 15 U.S.C. § 77q; a violation of section 12(1) of the 1933 Act, 15 U.S.C. § 77l (1); a violation of § 15 of the 1933 Act, 15 U.S.C. § 77o; violations of the Michigan Uniform Securities Act, M.C.L. §§ 451.810(a)(1), 451.810(a)(2), and 451.-810(b); and violations of the state common law. Plaintiff seeks the return of the balance of its initial investment plus a reasonable investment return.

Presently before the court is defendants' Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56. The motion has been fully and competently briefed by both plaintiff and defendants, including supplemental briefs filed at the request of the court. The court has carefully considered all the arguments and authorities relied upon by the parties in their briefs. For the reasons that follow, the Motion for Summary Judgment is GRANTED with respect to all counts.

## I. BACKGROUND

The pertinent facts viewed most favorably to plaintiff are as follows.

Plaintiff Montcalm County is a municipal corporation established under the laws of the State of Michigan. As Montcalm County's

Treasurer since 1982, Rosemary Long was responsible for investing the County's surplus funds. Investment of surplus public funds is but one small part of the substantial statutory duties of the county treasurer. The treasurer's primary duty is tax collection. Other duties include sale of dog licenses, inventory of bank boxes, working with township treasurers, and personnel management in the treasurer's office.

Defendant McDonald & Co. is a brokerage firm. Defendant Chigas was one of McDonald & Co.'s registered representatives. Before Chigas was hired by McDonald & Co., she was employed by Ashwell & Company Securities. During her employment at Ashwell & Co., defendant Chigas and Rosemary Long, Montcalm County's treasurer, came to know each other through the Michigan Association of County Treasurers ("MACT"). MACT is a support and information network for Michigan county treasurers. According to plaintiff, Treasurer Long placed trust in defendant Chigas and relied upon her expertise in assisting her in making investment decisions for the County over the years. She also relied on Chigas to keep her informed about securities held by Montcalm County since Chigas would have access to pertinent information from being "in the business." (Long sworn statement at 10, 15, 16, 20–22). On two occasions in 1983, Chigas contacted Long to inform her that there were problems with particular investments and to advise her to sell the investments prior to maturity. On both of those occasions, Chigas reinvested the County's funds, resulting in no loss to Montcalm County. (Long sworn statement at 10, 15–16, 20–22; Long depo. at 49).

In September 1988, defendant Chigas was hired as an investment broker by defendant McDonald & Co., first in its Michigan office, and later in its Chicago office. Chigas continued to provide investment services for Montcalm County and many other of her municipal clients after her change in employment.

Plaintiff alleges that McDonald held itself out to MACT in its advertisements as having "a reputation for carefully selected products." Montcalm County also alleges that it was never given any information about the issuer before purchasing an investment, and never warned of the risks involved in purchasing commercial paper. Long would call Chigas and tell her the County had a certain amount to invest for a designated period. Chigas would then select investments from the investments available that day and quote them to Long.

Beginning in March 1989, Chigas suggested Drexel Burnham Lambert commercial paper for investment to her clients, including plaintiff Montcalm County. At issue in this case are two corporate notes plaintiff purchased on September 13, and September 22, 1989. The first note had a face value of $455,175.11, with a maturity date of June 8, 1990. The second note had a face value of $104,090.70, with a maturity date of February 26, 1990. The total cost was just over $559,000. At the time of issuance, the notes were prime quality commercial paper, rated A–2 by Standard & Poor's and F–2 by Fitch, two standard rating services widely recognized by the industry.

Plaintiff alleges that defendant Chigas made the sales "notwithstanding numerous indications 'on the street' that Drexel Burnham was not a wise investment to offer to her customers, and without making any inquiry as to the stability of Drexel Burnham." As part of this allegation, plaintiff referred to two separate listings of the DBL commercial paper on Standard & Poor's "CreditWatch." The first CreditWatch report was issued on December 12, 1988,[1] and the second one was

---

1. The December 12, 1988, CreditWatch report stated the following:

Drexel Burnham Lambert Group, Inc.'s 'A–2' commercial paper rating is placed on CreditWatch with negative implications, reflecting a potential increase in credit and funding risks stemming from the firm's $3.5 billion bridge loan commitment to Kohlberg, Kravis, Roberts & Co.'s $24.6 billion acquisition of RJR Nabisco Inc. Relative to the firm's $1.4 billion

equity base, if funded, this commitment would represent a substantial concentration in credit risk and a material funding challenge. Drexel's strong placement and distribution capabilities should enable it to quickly prefund a sizeable portion of the loan commitment, thus limiting its final funding exposure and risk. If prefunding efforts are successful, S & P will reassess Drexel's risk position relative to its ultimate funding requirement. *Separately, the*

issued on January 30, 1989.[2] Although the CreditWatch report expressed concern about the "negative implications," *inter alia*, for Drexel Burnham resulting from a high risk loan to Kohlberg, Kravis, Roberts & Co. for the acquisition of RJR Nabisco, Inc., the CreditWatch report also specifically stated that "Drexel's strong placement and distribution capabilities should enable it to quickly prefund a sizeable portion of the loan commitment, thus limiting its final funding exposure and risk." Regarding the indictment alleging racketeering, conspiracy, securities fraud and other trading-related violations filed against an important Drexel Burnham executive, Michael Milken, the CreditWatch report also stated that "the financial impact of a possible criminal indictment against Drexel, involving potentially high fines and/or a settlement of charges, remains manageable at this time." Moreover, both CreditWatch reports were issued eight and nine months before the commercial paper was purchased. By the time the transaction was made, the DBL commercial paper had been removed from the CreditWatch report.

On November 30, 1989, the *Wall Street Journal* reported that Standard & Poor's had issued a downgrade of Drexel Burnham commercial paper from A–2 to A–3. On February 13, 1990, the Chairman of the SEC and the Secretary of the Treasury called Drexel Burnham management, demanding that Drexel Burnham seek bankruptcy protection. Drexel Burnham ceased all trading, and later that day, filed Chapter 11 bankruptcy. At that time, its commercial paper was still rated "prime"—A–3/F–3.

*financial impact of a possible criminal indictment against Drexel, involving potentially high fines and/or a settlement of charges, remains manageable at this time.*
(Emphasis added.) (Plaintiff Ex. 6).

2. The January 30, 1989, CreditWatch report update stated:
   Drexel's Burnham Lambert Group Inc.'s 'A–2' commercial paper rating remains on CreditWatch with negative implications reflecting the potential credit and funding risks inherent in the firm's $3.5 billion bridge loan commitment for Kohlberg, Kravis, Roberts & Co.'s $24.6 billion acquisition of RJR Nabisco, Inc. The rating was placed under surveillance Dec. 12, 1988. In addition, recent disclosures concerning the firm's anticipated settlement with the

On March 6, 1990, plaintiff's attorney met with defendants, and demanded that they guarantee plaintiff's loss by repurchasing the Drexel Burnham notes. Defendants refused. On May 17, 1991, plaintiff filed its ten-count Complaint. Plaintiff seeks rescission of its purchase, and judgment against defendants McDonald and Chigas, jointly and severally, in the amount of $559,265.81, plus interest, attorneys' fees, costs and any other relief as the court deems proper.

Presently before the court is defendants' Motion for Summary Judgment on all counts of the complaint.

## II. DEFENDANTS' MOTION TO WITHDRAW ADMISSION

At the threshold of considering defendants' Motion for Summary Judgment, the court must decide whether it should allow the withdrawal of defendants' admission that they offered or sold the Drexel Burnham commercial paper to plaintiff Montcalm County within the meaning of section 12(2) of the 1933 Act. A brief summary of the litigation concerning the issue of defendants' admission is in order.

In the Answer and Affirmative Defenses of Defendants McDonald & Company Securities, Inc., and Lisa Lowe Chigas to the First Amended Complaint of Montcalm County Board of Commissioners, defendants answered two of the allegations as follows:

83. ALLEGATION: McDonald and Lowe solicited the purchase of the Drexel Burnham commercial paper by Montcalm County.

Securities & Exchange Commission and an expected guilty plea to criminal charges raise uncertainties surrounding the status of Drexel's California junk bond operations, and certain regulatory, state, and federal operating licenses. While Drexel's guilty plea would potentially heighten funding risks, *the company maintains ample secured borrowing capacity to meet anticipated funding requirements. Further, prior reserve actions and stable operating profits would minimize the potential loss and increased financial leverage impact from the $650 million settlement, $300 million of which is allocated to settle criminal charges, and $350 million to cover potential civil lawsuits.*
(Emphasis added.) (Plaintiff Ex. 6).

RESPONSE: Defendants deny the allegations contained in paragraph 83 because they are untrue.

84. ALLEGATION: McDonald and Lowe offered or sold the Drexel Burnham commercial paper to Montcalm County, within the meaning of section 12(2) of the 1933 Act.

RESPONSE: Defendants deny the allegations contained in paragraph 84 because they are untrue.

However, several months later, defendants, in their Responses to Plaintiff's First Discovery Requests, admitted that they "offered or sold the Drexel Burnham commercial paper to Montcalm County within the meaning of section 12(2) of the 1933 Act." In subsequent exchanges, including defendants' mediation summary, defendants' Motion for Summary Judgment, and defendants' Responses to Plaintiff's Third Discovery Requests, defendants reinstated their initial position and denied that they were statutory sellers under section 12(2). Mere changes in their later answers, however, did not constitute a motion by defendants to withdraw or amend their previous admission.

On May 26, 1993, this court issued an order directing the parties to advise the court if the issue of whether defendants were sellers under section 12(2) is still before the court. Only then did defendants file a Motion for the Withdrawal and Amendment of the Responses under Fed.R.Civ.P. 36(b).

Defendants now claim that the admission was a clerical error. Defendants further argue that their answer was not a response to a demand for admission by plaintiff under Fed.R.Civ.P. 36, but rather an interrogatory answer, which is not binding on defendants. I disagree. Plaintiff Montcalm County's "First Discovery Requests to Defendant McDonald & Company Securities, Inc." was clearly brought under Fed.R.Civ.P. 36 (Request for Admissions), as well as under Fed.R.Civ.P. 33 (Interrogatories) and Rule 34 (Request for Production of Documents). The paragraph clearly asks defendants to "Admit that McDonald & Company and Lisa Lowe offered or sold the Drexel Burnham commercial paper to Montcalm County within the meaning of section 12(2) of the 1933 Act." Defendants began their answer by using the word "admit." They then admitted they offered or sold the Drexel Burnham commercial paper.

Defendants' treatment of their admission in their Responses to Plaintiff's First Discovery Requests is at best tardy. At worst, it gives rise to an inference of indifference to a crucial issue. Defendants ignored their having made this admission until the court ordered them to advise the court on the issue. However, despite my determination that defendants were dilatory, I am nevertheless satisfied that defendants' motion to withdraw their admission should be granted.

■ According to Fed.R.Civ.P. 36(b), as amended in 1970:

Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provision of Rule 16 governing amendment of a pre-trial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

The court's discretion to permit withdrawal or amendment of admissions must be exercised within the bounds of this two-part test: 1) the presentation of the merits must be subserved by allowing withdrawal or amendment; and 2) the party that obtained the admissions must not be prejudiced in its presentation of the case by the withdrawal. See St. Regis Paper Co. v. Upgrade Corp., 86 F.R.D. 355, 357 (W.D.Mich.1980). See also American Auto. Ass'n v. AAA Legal Clinic, 930 F.2d 1117, 1119 (5th Cir.1991); Farr Man & Co. v. M/V Rozita, 903 F.2d 871, 876 (1st Cir.1990); Smith v. First Nat'l Bank, 837 F.2d 1575, 1577 (11th Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 64, 102 L.Ed.2d 41 (1988).

■ Applying the test to the present case, I am satisfied that allowing withdrawal of defendants' admission will facilitate and maintain the merits of the case. The issue

involving section 12(2) is the main issue in this case upon which all other counts depend. More importantly, throughout the entire pleading stage, plaintiff has never been lulled into believing that whether defendants were "sellers" within the meaning of section 12(2) was no longer an issue before the court. Both plaintiff and defendants treated section 12(2) as a major issue, and competently and fully briefed it. Defendants' official motion for withdrawal, though late, does not cause plaintiff a sudden need to obtain evidence that it did not otherwise expect to produce. Plaintiff has failed to satisfy the court that it would suffer prejudice from the withdrawal of the admission. *See LaJINESS v. Reactor Controls, Inc.,* 642 F.Supp. 27 (E.D.Mich. 1985) (defendant's motion to withdraw admission granted when plaintiffs failed to establish they would suffer prejudice).

Having determined the need to consider the merits of the matter and the lack of prejudice to plaintiff, I hereby grant defendants' motion for withdrawal of their admission.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The crux of summary judgment is determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). In making this determination, the court must examine the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Kramer v. Bachan Aerospace Corp.,* 912 F.2d 151, 153–54 (6th Cir.1990). If the moving party demonstrates there is an absence of evidence supporting the nonmoving party's case, the party opposing the motion must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Kramer,* 912 F.2d at 153–54. To sustain this burden, the non-moving party cannot rest on the mere allegations of the pleadings. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). Rather, the non-moving party must come forward with specific facts to support its claims and show there is a genuine issue for trial. *Id.*

In recent years, the Supreme Court has encouraged the use of summary judgment where appropriate to ensure just, speedy, and efficient determinations in each case. *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555; *Daughenbaugh v. Bethlehem Steel Corp.,* 891 F.2d 1199, 1205 (6th Cir.1989). The Sixth Circuit has recognized that the federal courts have entered a "new era" in summary judgment practice. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478–81 (6th Cir.1989). As a result, mere allegations in support of the non-moving party are inadequate because the "mere existence of a scintilla of evidence in support of the positions will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989).

### IV. SECTION 12(2) OF THE 1933 ACT

#### A. McDonald & Co. Was Not a Seller.

In Count I, plaintiff seeks rescission under section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2). In Count III, plaintiff seeks rescission under the parallel provision of § 410(a)(2) of the Michigan Blue Sky Law, M.C.L.A. § 451.810(a)(2). As the language of the sections of both statutes is strikingly similar, and the state law claim hinges on the disposition of the federal claim, the court will

not discuss the scope of Michigan's counterpart to section 12(2).

15 U.S.C. § 77l(2) states as follows:

Sec. 12. Any person who—

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Defendants seek dismissal on these counts on the basis that no "sale" occurred between plaintiff and defendants. Section 2(3) of the 1933 Act defines "sale" or "sell" to include "every contract of sale or disposition of a security or interest in a security, for value." Section 2(3) also defines the terms "offer to sell," "offer for sale," or "offer" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3).

The landmark case on the elements required to make one a statutory seller of securities is *Pinter v. Dahl,* 486 U.S. 622, 644–45, 108 S.Ct. 2063, 2077, 100 L.Ed.2d 658 (1988). The Supreme Court formulated the following test to determine who would be considered "sellers" under section 12(1): "The language and purpose of § 12(1) suggests that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. at 2078. Although the definition of "seller" set forth in *Pinter* was in context of section 12(1) of the Securities Act, every appellate court that has considered the question has determined that *Pinter* applies equally to section 12(2) of the Act, which prohibits offering or selling security by means of a prospectus or oral communication containing an untrue statement of material fact. *See Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.,* 713 F.Supp. 1019, 1024 (W.D.Mich.1989), *aff'd without op.,* 933 F.2d 1008 (6th Cir.1991).

Prior to the Supreme Court's decision in *Pinter v. Dahl,* the Sixth Circuit, like the Fifth Circuit and others, adopted the "proximate cause" theory of liability.[3] *Ryder Int'l Corp. v. First American Nat'l Bank,* 943 F.2d 1521, 1524–25 (11th Cir.1991). The standard then was that "a defendant who did not actually pass title to securities could be treated as a seller under § 12(2) if 'the injury to the plaintiff flow[ed] directly and proximately from the actions from this particular defendant.'" *Smith v. American National Bank and Trust Co.,* 982 F.2d 936, 941 (6th Cir.1992) (citing *Davis v. AVCO Financial Services, Inc.,* 739 F.2d 1057, 1065–66 (6th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985)). The Supreme Court in *Pinter* squarely rejected the "substantial factor" approach, saying "[t]here is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who 'offer,' including those who 'solicit' offers." 486 U.S. at 650, 108 S.Ct. at 2080.

The primary case relied on by defendants is *Ryder Int'l Corp. v. First American Nat'l Bank,* 943 F.2d 1521 (11th Cir.1991), a case

---

**3.** Prior to *Pinter,* the Third and Seventh Circuits had held that § 12(2) required privity, while the Second, Fourth, Fifth, Sixth, Eighth, Ninth and Eleventh Circuits had adopted either a "substan-tial factor" test, a "proximate cause" test or a variation thereof to determine the class of participants who could be liable under § 12(2). *Ryder,* 943 F.2d at 1524–25.

almost identical to the present one. In *Ryder*, the court faced a section 12(2) claim by Ryder against a bank, First American, for the sale of corporate commercial paper which failed. Central to *Ryder* was the court's conclusion that the bank's conduct—providing financial information concerning the available commercial paper for sale by others and its mechanically executing Ryder's orders to buy—did not make the bank an "offeror" or a "seller" under section 12(2). *See also Smith v. American National Bank and Trust Co.*, 982 F.2d 936 (6th Cir.1992). In *Smith*, plaintiff invested in an automobile dealership. Plaintiff agreed to guarantee $600,000 to cover overdrafts for the dealership in exchange for an option to purchase fifty-one percent of the stock of the dealership and a half interest in certain real estate. The agreement between plaintiff and the dealership owner was reached without any participation or solicitation by defendant bank. When plaintiff met with defendant bank to discuss the note, defendant bank never disclosed the problems, such as that the dealership's "overdraft" had been caused by the kiting scheme, even though defendant bank was aware of financial problems at the dealership. After the dealership's overdrafts were paid with the loan proceeds, the dealership went bankrupt. Plaintiff sued the bank for alleged failure to disclose the dealership's financial condition. The district court dismissed plaintiff's claim against the bank under section 12(2), concluding that plaintiff failed to state a claim under section 12(2) because it failed to allege that the defendant bank solicited plaintiff's purchase.

On appeal, the Sixth Circuit affirmed, stating that "[t]he fact that one is not an actual owner of securities does not necessarily prevent him from being a statutory seller. However, a non-owner cannot be a seller unless he urges a prospective purchaser to buy." *Smith*, 982 F.2d at 941 (citing *Pinter v. Dahl*, 486 U.S. 622, 644–45, 108 S.Ct. 2063, 2077–78, 100 L.Ed.2d 658 (1988)). *See also Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 493 (6th Cir.1990). Based on *Pinter* and the recent *Smith* case in this circuit, the current test is "whether the defendant either passed title or offered to do so, or solicited an offer." *Smith*, 982 F.2d at 942.

**1. Defendants did not pass title to plaintiff.**

Applying this test to the section 12(2) claim asserted in plaintiff Is complaint, I conclude that plaintiff has failed to make a sufficient showing to establish existence of this essential element. It is manifest from the record that McDonald did not own or hold the Drexel Burnham commercial paper bought by Montcalm County at any time prior to or after the purchase. The Drexel Burnham commercial paper was "bearer" paper. The trade dates and the settlement dates were the same. The customer chose the purchase date, the amount of purchase, and the maturity date. Once purchased, the broker held the commercial paper in safekeeping, pending maturity or further instructions. *See Ryder*, 943 F.2d at 1530.

**2. Defendants did not make solicitations.**

Since defendants possessed no title to transfer to plaintiffs, does the record create a question of fact whether defendants solicited an offer from plaintiff to buy the commercial paper? The record in this case unequivocally establishes that defendants made no solicitations.

Under *Pinter*, the person sought to be charged must *solicit* and be "motivated at least in part by a desire to serve his own financial interests...." In other words, *Pinter* created a two-prong solicitation test: "first, whether a participant in the sale 'solicited' the purchase; and second, whether the participant or the owner of the security sold benefited." *See* Joseph E. Reece, *Would Someone Please Tell Me the Definition of the Term 'Seller': The Confusion Surrounding Section 12(2) of the Securities Act of 1933*, 14 Del.J.Corp.L. 35, 104–05 (1989). "Pinter apparently requires someone to be an issuer or a paid participant who actually contacted a buyer and *urged* the buyer to purchase before such participant would meet the first prong of the solicitation test." *Id.* at 105.

Based on the record before me, plaintiff has failed to produce evidence that defendants actually contacted plaintiff and urged plaintiff to purchase the commercial paper in

dispute. It is undisputed that no purchase of commercial paper for Montcalm County was ever executed by defendants except upon a request by plaintiff. (Plaintiff's admissions, No. 122). Plaintiff admits that when the County had excess funds for investment, plaintiff would call defendant Chigas. Defendant Chigas would then select appropriate investments from the investments available that day and quote them to plaintiff. The County's only restriction upon commercial paper investment was that it conform with the requirements of Mich.Comp.Laws § 129.-91,[4] which permitted investment in commercial paper in any of the three highest rating categories by any two standard rating services. Plaintiff concedes that the Drexel Burnham commercial paper was appropriate under the prevailing Montcalm County investment resolutions. (Plaintiff's admissions, No. 57). Furthermore, contacts were always initiated by plaintiff, except for the occasional reminder of a maturing investment. These contacts were not in fact solicitations. *See Ryder,* at 1530.

Plaintiff argues that the fact defendant Chigas allegedly made approximately 42 percent of her total income selling Drexel Burnham commercial paper during the period in question (March 15, 1989 through November 30, 1989) is proof of defendants' solicitation. Plaintiff further claims that the solicitation was additionally evidenced by nearly 150 separate sales of the commercial paper Chigas made to her clients with a face value exceeding $114 million in less than nine months. All the above, plaintiff argues, justifies drawing an inference that defendant Chigas was urging her customers to purchase the Drexel Burnham commercial paper. Plaintiff claims that it also justifies drawing the conclusion that encouraging her customers to buy Drexel Burnham paper was in defendant Chigas's financial interest.

I disagree. The mere collection of a commission does not automatically convert a broker's conduct into a "solicitation." Obtaining a commission is a customary business practice. All brokers charge commissions. That they do is not in and of itself a determining factor either way. *Ryder,* 749 F.Supp. at 1579. In fact, plaintiff admits that it has no evidence of other profits, incentive or promotion in connection with the Drexel Burnham commercial paper at issue in this action. (Plaintiff's admission, No. 46). Therefore, defendants' relationship with Drexel Burnham was no different than their relationships with any other commercial paper issuers. The customary commission alone is not sufficient to show defendants' financial interests in orchestrating the specific sale of Drexel Burnham commercial paper. No evidence exists to demonstrate that defendants had more motivation to sell the Drexel Burnham commercial paper than other investments.

The only other evidence plaintiff adduced suggesting that defendants "solicited" the purchase of the Drexel Burnham commercial paper is an advertisement placed by McDonald in the Program Directory for the annual conference of the Michigan Association of County Treasurers. The advertisement stated the following:

> We have earned a reputation for carefully selected products, experienced people, and reliable service. We are sensitive to the financial environment in which Michigan County Treasurers operate. And we are nearby for fast personalized response to your needs.

Even with all reasonable inferences drawn in favor of defendants, this advertisement is insufficient to amount to active solicitation. The generic advertising has no direct relationship to the case. Plaintiff's affidavit states that its dealings with defendant Chi-

---

4. Mich.Comp.Laws § 129.91 states in pertinent part:

Sec. 1. (1) The legislative or governing body of a county, city, village, township, or special assessment district, or an agency, board, or commission of a county, city, village or township, by resolution, may authorize its treasurer or other chief fiscal officer to invest surplus funds belonging to and under the control of the political subdivision, special assess-

ment district, or agency, board, or commission of a county as follows:

....

(c) In commercial paper rated at the time of purchase within the 3 highest classifications established by not less than 2 standard rating services and which matures not more than 270 days after the date of purchase. Not more than 50% of any fund may be invested in commercial paper at any time.

gas began in 1981, when she was associated with Ashwell & Co. (Long sworn statement at 8). Plaintiff then continued dealing with Chigas after she terminated her employment with Ashwell & Co. and moved to defendant McDonald & Co. There is no evidence that this generic advertising played any part whatsoever, either in the continuing dealings between plaintiff and defendant Chigas, or as an inducement to plaintiff's "beginning" its dealings with defendant McDonald.

■ Moreover, all brokers generally solicit business. However, such general solicitation of business does not convert a broker into a section 12(2) "seller," "offeror" or "solicitor." *See Ryder Int'l Corp. v. First American Nat'l Bank,* 749 F.Supp. 1569, 1579 (N.D.Ala. 1990), *aff'd,* 943 F.2d 1521 (11th Cir.1991). Advertising slogans, such as, "When E.F. Hutton Talks, People Listen," and the alleged characterization of certain bonds as "marvelous," "do not constitute representations of fact that could be actionable under the securities laws." *See Zerman v. Ball,* 735 F.2d 15, 21 (2d Cir.1984). *See also Rotstein v. Reynolds & Co.,* 359 F.Supp. 109, 113 (N.D.Ill.1973) (statement that defendant's stock was "a red hot stock and plaintiff could not lose on [such an investment]" are mere puffing and are not actionable under either the federal or state securities laws.) Defendant McDonald's marketing its service as reliable, personalized, and the like does not constitute representations of fact that could be actionable under the securities laws.

■ "Brokers have been held liable as 'sellers' only in those cases where they were closely aligned with the title-holding parties or worked as agents of the securities issuers." *Craighead* 899 F.2d at 493 (citing *Pinter,* 486 U.S. at 645, 108 S.Ct. at 2077; *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 364–65 (4th Cir.1986); *Leonard v. Shearson Lehman/American Express Inc.,* 687 F.Supp. 177, 179–80 (E.D.Pa.1988); *Beck v. Cantor, Fitzgerald & Co.,* 621 F.Supp. 1547, 1560–62 (N.D.Ill.1985)). The record is clear that defendants, acting as agents of the purchaser of the securities, in reality bought on behalf of the purchaser rather than sold on behalf of the owner. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng,* 697

F.Supp. 1224, 1228–29 (D.D.C.1988) ("there is no reading of [section 12(2)] that would broaden its application to a broker/dealer who *buys* on behalf of a customer/plaintiff"). Buying something for someone as his agent is not tantamount to selling it to him. Furthermore,

> Most securities firms engage in all aspects of the securities business, acting at various times as underwriters, dealers, or brokers. As underwriter and dealer, the firm buys and sells securities on its own account thereby assuming all risk of loss. As broker, the firm buys and sells securities as an agent for the account of customers. In these transactions, it is the customer, rather than the securities firm, who bears the risk of loss.

*Securities Indus. Ass'n v. Board of Governors,* 468 U.S. 207, 218 n. 18, 104 S.Ct. 3003, 3009 n. 18, 82 L.Ed.2d 158 (1984).

The complaint itself contains no allegation that defendants Chigas and McDonald actively participated in the solicitation of an offer to purchase the stock. To the contrary, the evidence as a whole demonstrates that defendants did not solicit plaintiff for the purchase of the Drexel Burnham commercial paper. *See Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 536–37 (9th Cir.1989) (mere performance of professional services without active solicitation of the purchase does not give rise to section 12(2) liability); *Capri v. Murphy,* 856 F.2d 473, 478–79 (2d Cir.1988) (defendant who played a major role in setting up venture is not a section 12(2) seller unless plaintiffs can show defendant actually solicited their investment). It is evident from the record that defendants did not induce plaintiff to buy the Drexel Burnham commercial paper. Plaintiff made the final decision as to which securities to purchase. In the absence of active solicitation on the part of defendants, I hold that defendants are not "sellers" for purposes of section 12(2). Therefore, liability under section 12(2) cannot be imposed.

**B. Misrepresentation of Material Facts Under Section 12(2)**

■ In addition to the requirement that defendant be a "seller" of securities, section

12(2) imposes liability only upon one who misrepresents a material fact or omits to state a material fact "by means of a prospectus or oral communication" when selling a security. A person who offers or sells a security in the above manner may be liable to an unknown purchaser. "A fact is 'material' if it is substantially likely that a reasonable investor would consider the matter important in making an investment decision." *Platsis v. E.F. Hutton & Co.*, 642 F.Supp. 1277, 1293 (W.D.Mich.1986), *aff'd*, 829 F.2d 13 (6th Cir.1987), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988). *See also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

In Count I, plaintiff Montcalm County claims that defendants McDonald and Chigas failed to state certain material facts in their offer and sale of the Drexel Burnham commercial paper. Plaintiff further claims that defendants should have known that the omissions would be relevant to plaintiff regarding the rate of return of the security sold to the County.

Since I have determined that defendants were not "sellers" or offerors of securities for purposes of section 12(2), I need not reach the issue of whether plaintiff has raised a genuine issue of material fact as to whether defendants McDonald and Chigas had knowledge of and omitted information regarding Drexel Burnham's financial condition in their communication with plaintiff. *See Ryder*, 943 F.2d at 1534.

For the foregoing reasons, I conclude that defendants McDonald and Chigas were not statutory "sellers," and no cause of action may be maintained under section 12(2) of the 1933 Act, nor under section 410 of the Michigan Blue Sky Law.

I hereby grant summary judgment as to Count I and Count II.

## V. EXEMPTION OF THE DREXEL BURNHAM COMMERCIAL PAPER FROM REGISTRATION UNDER SECTION 3(a)(3) OF THE SECURITIES ACT OF 1933

■ In Count V, plaintiff alleges defendants sold Drexel Burnham commercial paper which had not been registered and was not exempt from registration under the statute in violation of section 12(1) of the 1933 Act, 15 U.S.C. § 77*l*(1). While section 12(2) creates liability for omissions and misrepresentations in a prospectus or oral communication, section 12(1) creates liability for the sale of unregistered securities. *Ryder* at 1529.

Since I have already found that no sale existed, there can be no liability under section 3(a)(3) of the Securities Act of 1933. Although I am satisfied the commercial paper at issue in this case was exempt from registration because it was of prime quality and that it was not ordinarily purchased by the general public, the issue is moot in light of my finding regarding "sale." *See* SEC Securities Act Release No. 33–4412, 26 Fed. Reg. 9158 (Sept. 20, 1961); Surplus Funds Investment Act, Public Act 20, M.C.L. § 129.91(1)(c); *In re NBW Commercial Paper Litig.; American Federation of State, County and Municipal Employees v. FDIC*, 813 F.Supp. 7 (D.D.C.1992); Louis Loss & Joel Seligman, III Securities Regulation 1139, 1191 (3d ed. 1989); *Baurer v. Planning Group, Inc.*, 669 F.2d 770, 777 (D.C.Cir.1981).

## VI. MICHIGAN BLUE SKY LAW

In Count IV of the amended complaint, plaintiff alleges a violation of the Michigan Uniform Securities Act, § 410(a)(1), M.C.L. 451.810(a)(1), which prohibits offer or sale of a security in violation of section 301.

Section 301 of the Michigan Blue Sky Law permits sale of an unregistered security if it is "exempt under Section 402." Section 402(a)(9), M.C.L.A. 451.802(a)(9) states:

> Any prime quality negotiable commercial paper sold in an aggregate amount of not less than $25,000 to any 1 purchaser which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which evidences an obligation to pay cash at a fixed date within 9 months of the date of issuance, exclusive of days of grace, or any nonautomatic renewal of such commercial paper which is likewise limited, or any guarantee of such commercial paper or of

any such renewal if the commercial paper is sold through a registered broker-dealer or an institution whose securities are exempted under subsection (a)(3).

M.C.L.A. 451.802(a)(9) (West 1989 & Supp. 1992).

In interpreting the meaning of this exemption, the Michigan Supreme Court has applied the interpretations of the SEC in relation to section 3(a)(3) of the 1933 Act. *People v. Dempster*, 396 Mich. 700, 242 N.W.2d 381 (1976). In addition, the State of Michigan enacted an act to amend section 1 of Act No. 20 of the Public Acts of 1943, entitled, "An Act Relative to the Investment of Surplus Funds of Political Subdivisions of the State." The amended section requires that commercial paper eligible for municipal investment be

> rated at the time of purchase within the 3 highest classifications established by not less than 2 standard rating services and which matures not more than 270 days after the date of purchase.

M.C.L.A. § 129.91(1)(c).

The similarity of the purpose and provisions of the state and federal securities regulations cannot be ignored. Although the interpretation of the federal securities law is not in any way binding on state court, or vice versa, "interpretation of one offers valuable guidelines as to the interpretation of the other." *People v. Breckenridge*, 81 Mich. App. 6, 16–17, 263 N.W.2d 922, *leave denied*, 402 Mich. 915 (1978). Therefore, the same proofs adduced by defendants [5] regarding the section 3(a)(3) exemption under the 1933 Act are applicable to the court's interpretation of sections 410(a)(1), 301 and 402(a)(9) of the Michigan Blue Sky Law.

For the reasons stated above under the discussion of section 3(a)(3), although I conclude that the Drexel Burnham commercial paper was also exempt from registration under the Michigan Blue Sky Law, the issue is moot is light of my finding regarding "sale." Therefore, Count IV is dismissed.

## VII. PRIVATE CAUSE OF ACTION UNDER SECTION 17(a)

■ In Count II, plaintiff alleges a violation of section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a).

15 U.S.C. § 77q states in pertinent part:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

> (1) to employ any device, scheme, or artifice to defraud, or
>
> . . . .
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
>
> . . . .

(c) The exemptions [to registration] provided in section 77c of this title shall not apply to the provisions of this section.

There is a split among the circuits as to whether a civil cause of action is implied under section 17(a). *See* Louis Loss, *The Assault on Securities Act Section 12(2)*, 105 Harv.L.Rev. 908 (Feb. 1992) (commentary). The Sixth Circuit has in the past implied the existence of a section 17(a) private cause of action. *Nichols v. Merrill Lynch, Pierce, Fenner & Smith*, 706 F.Supp. 1309, 1315 (M.D.Tenn.1989) (quoting *e.g., Gutter v. Merrill Lynch, Pierce, Fenner & Smith*, 644 F.2d 1194, 1196 (6th Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982); *Nickels v. Koehler Mgmt. Corp.*, 541 F.2d 611, 614 (6th Cir.1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)). In 1990 the Sixth Circuit confirmed a private cause of action in *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 492 (6th Cir.1990), stating:

> Whether section 17(a) provides for a private cause of action has been the subject of debate between the circuits and the Supreme Court for decades. To date, the Supreme Court has expressly reserved the

---

**5.** The Uniform Securities Act, M.C.L.A. § 451.-802(c), states: "In any proceeding under this act, the burden of proving an exemption or an exception tion from a definition is upon the person claiming it."

question in five cases. Five circuits, the Fourth, Fifth, Eighth, Ninth, and Eleventh, have held that section 17(a) does not imply a private cause of action. The Second and Seventh Circuits have left the question "open."

This court has held that section 17(a) implies a private cause of action only for "purchasers." *Gaff v. FDIC*, 814 F.2d 311, 319 (6th Cir.), *vacated in part on other grounds*, 828 F.2d 1145 (1987); *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194, 1196–97 (6th Cir.1981), *cert. denied*, 455 U.S. 909 [102 S.Ct. 1256, 71 L.Ed.2d 447] (1982); *Simmons v. Wolfson*, 428 F.2d 455, 456 (6th Cir.1970) (per curiam), *cert. denied*, 400 U.S. 999 [91 S.Ct. 459, 27 L.Ed.2d 450] (1971).

Based on the above, I am satisfied in this circuit, at the present time at least, a private cause of action for "purchasers" exists under section 17(a). However, whether plaintiff has a cause of action under section 17(a) depends upon whether defendants are "sellers" under the statute. As discussed above, plaintiff has failed to produce sufficient evidence that defendants ever owned the Drexel Burnham commercial paper, or solicited plaintiff to purchase such paper, and that defendants were ever affiliated or associated with, or acted as agents of Drexel Burnham. The court has determined that defendants in the instant case acted as agents of plaintiff rather than as agents of Drexel Burnham. Therefore, defendants are not "sellers." Count II on section 17(a) shall be dismissed.

## VIII. PRIVATE CAUSE OF ACTION UNDER SECTION 15

■ In Count VII, plaintiff alleges a violation of section 15 of the 1933 Act, 15 U.S.C. § 77o, which states as follows:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

The statute expressly provides for controlling person liability where there is underlying section 11 and 12 liability. The Sixth Circuit has not adopted a test for liability as a "controlling person" under the securities laws. *Sanders Confectionery Products, Inc. v. Heller Financial Inc.*, 973 F.2d 474, 486 (6th Cir.1992). However, the Sixth Circuit in *Sanders* cited with approval the test of a controlling person articulated in *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). In *Metge*, a two-prong test for controlling person liability is stated as follows:

The plaintiff needs to establish 'that the defendant ... actually participated in (i.e., exercised control over) the operations of the [broker/violator] in general ... [and] that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated.'

*Sanders*, 973 F.2d, at 486 (quoting *Metge*, 762 F.2d at 631).

As I have concluded that defendants did not offer or sell the Drexel Burnham commercial paper, and there is no liability under section 12(2), I need not reach the issue of the relationship between the two defendants. Defendant's motion on the Count VII claim on controlling person liability will be granted.

## IX. COMMON LAW CLAIMS

■ The three remaining counts relate to common law theories of negligence (Count VIII), breach of fiduciary duty (Count IX), and fraud (Count X). Defendants argue that since plaintiff is seeking relief under the Michigan Blue Sky Law for rescission, the Blue Sky Law should be plaintiff's exclusive remedy, and that counts alleging common law theories should be dismissed by summary judgment.

Defendants are mistaken on this issue. Michigan Uniform Securities Act ("MUSA") § 410(h) expressly provides that "[t]he rights and remedies provided by [MUSA] are in addition to any other rights or remedies that may exist at law or in equity...." Thus, any common law causes of action which exist can be maintained by the plaintiff, notwithstanding the causes of action created by the MUSA. M.C.L.A. § 451.810(h).

Defendants' reliance on *Kirkland v. E.F. Hutton & Co., Inc.*, 564 F.Supp. 427 (E.D.Mich.1983), is misplaced. First, *Kirkland* ignored the MUSA provision which expressly reserves to plaintiff the right to bring common law causes of action. Second, *Kirkland* was based upon two Michigan Supreme Court cases, *Wickstrand v. Nelson*, 273 Mich. 393, 263 N.W. 404 (1935), and *Barth v. Klicpera*, 248 Mich. 460, 227 N.W. 757 (1929), which were superseded by *Detwiler v. Glavin*, 377 Mich. 1, 138 N.W.2d 336 (1965). Those two earlier cases were decided under Michigan's former securities statute which did not contain a provision expressing reserving common law causes of action.[6]

In *Detwiler v. Glavin*, the Michigan Supreme Court held that a defrauded purchaser had his choice of remedies. He may proceed with his action for rescission under section 20 of the Michigan Blue Sky Law, or he may pursue his right under the common law. The purpose of the Blue Sky Law, according to the Court:

> was not to deprive plaintiffs of an existing cause of action, but to create a statutory remedy for those to whom sales were made in violation of the act.

*Detwiler*, 138 N.W.2d at 339.

Based on the *Detwiler* opinion, plaintiff in the case at bar clearly has "at their option two causes of action—one under the statute and the other at common law—neither one of which is exclusive." *Id.* at 340–41. *See Charney v. Thomas*, 372 F.2d 97, 98–99 (6th Cir.1967). *See also Campbell v. Shearson/American Express, Inc.*, [1984–1985 Transfer Binder] Blue Sky L.Rep. (CCH) ¶ 72,293, at 71,412 (E.D.Mich. Aug. 9, 1985).

However, I grant defendants' motion to dismiss these common law counts without prejudice. Jurisdiction of these counts is based upon the existence of a federal question. The court has jurisdiction over the above common law claims only as they are pendent to the federal causes of action.

The court may exercise pendent jurisdiction where the "state and federal claims ... derive from a common nucleus of operative fact ... such that [plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Furthermore,

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.* at 726, 86 S.Ct. at 1139.

Accordingly, the court will exercise its discretion in ordering the pendent state claims dismissed without prejudice for lack of a substantial federal claim.

## X. CONCLUSION

For all the reasons discussed above, defendants' Motion for Summary Judgment is GRANTED.

## *ORDER*

In accordance with the opinion filed this date,

**IT IS ORDERED** that defendants' motion for summary judgment on Counts I, II, III, IV, V, VI, and VII is **GRANTED.**

**IT IS FURTHER ORDERED** that common law Counts VIII, IX, and X are **DISMISSED WITHOUT PREJUDICE.**

---

6. An overhaul of Michigan's securities law oc-    curred in 1965.